OPINION OF THE COURT
Lawrence E. Kahn, S.
This proceeding is the first intermediate accounting by Chemical Bank, Henry M. Sage, Richard M, Goldwater and *791 Isadore Daniels as trustees of the testamentary trust created under article 8-B of the will of Cornelia C. Sage. In addition thereto, there is a request for the Surrogate’s guidance and direction as to whether the trustees have authority to invade the principal of the trust to pay certain expenses incurred by a life beneficiary thereof. There is substantial disagreement between the corporate trustee and the individual trustees as to whether such payments should be made. William P. Soronen, Jr., has been appointed guardian ad litem by the court to represent the interests of Henry M. Sage, III, an infant remainderman of the trust in question, as well as any infant remaindermen born hereafter.
Cornelia C. Sage died on May 9, 1972 and her will and codicil were thereafter admitted to probate on June 20, 1972. By decree of accounting dated September 8, 1976, the executors of this estate were discharged and the testamentary trust, which is the subject of this litigation, was funded. Under paragraph 8-B of the will, the decedent established said testamentary trust which provided that the income therefrom would be payable from time to time, in the absolute discretion of the trustees, to the decedent’s son, Henry M. Sage, and his issue who shall be living at the time of such payment. Presently, Henry M. Sage has four living issue, to wit, Lynn S. Jackson, Reginald D. Sage, Henry M. Sage, Jr., and David P. Sage. The trust is scheduled to terminate upon the death of Henry M. Sage and all his children. Thereafter, the principal and accrued income are to be distributed to the issue of Henry M. Sage who shall then be living. Distributions of income from this trust are provided for in paragraph 10 of decedent’s last will and testament. The trust is specifically made spendthrift by this article. The payment of such income is completely discretionary with the trustees. This article also provides for a limited power to invade principal. Invasions may only be made to meet the "expenses of any mental or physical sickness, injury or disability, accident or other emergency affecting the health or welfare” of the beneficiary or the beneficiary’s spouse or issue, or "to meet expenses of going into a business * * * or of purchasing, building or altering a home”. This article expressly directs that no payment of principal may be made to or for the benefit of Henry M. Sage, other than the use of a portion thereof to acquire certain real property for the benefit of Mr. Sage or his issue.
At the outset of this trust, Chemical Bank and Henry M. Sage qualified as trustees. Thereafter, pursuant to the power *792 contained in the trust agreement, Mr. Sage appointed Richard M. Goldwater as the second individual cotrustee. Mr. Sage subsequently resigned as cotrustee. Trustee Goldwater then, as sole individual trustee in office, appointed Isadore Daniels to act as cotrustee with him. Trustee Daniels resigned as of December 31, 1977, and this proceeding seeks to discharge both Mr. Sage and Mr. Daniels from liability as trustees. In conjunction with the intermediate accounting, Chemical Bank seeks to be discharged from any liability as cotrustee through the date of this intermediate accounting. The court is also asked to authorize the payment of commissions and legal fees and that letters of cotrusteeship be issued to Herbert Cahn, the individual appointed as the second cotrustee by Mr. Goldwater. Additionally, Mr. Goldwater, as individual cotrustee, has cross-petitioned seeking substantially the same relief as Chemical Bank, except that, he also has asked the court to approve an invasion of principal on behalf of Henry M. Sage, Jr., in the amount of $100,000 to pay for medical and other expenses incurred with respect to the imprisonment of Henry Sage, Jr., and his wife in Brazil, or in the alternative that the court approve a loan agreement among the income beneficiaries of the trust to repay said $100,000 sum.
Initially, the court is asked to instruct the trustees whether and to what extent they may, under the terms of the trust, make additional payments of principal to Henry M. Sage, Jr., to repay certain expenses incurred by Henry M. Sage on behalf of his son and daughter-in-law, the total amount being $100,000, which includes payments totaling $25,000 hereinbefore made, and further to instruct the trustees whether they may make the requested payments by unsecured, interest-free loans to Henry M. Sage and his issue. Such loans would be repaid out of all or some part of any income distributions to be made to them hereafter. In resolving these questions, the court must first set forth the most unusual set of circumstances which gives rise to these requested invasions.
On May 20, 1976, Henry Sage, Jr., also known as Ricky, and his wife, Karen, were taken into custody by officials of the Brazilian Government and charged with the illegal possession of drugs. Much documentary evidence has been presented to this court to graphically illustrate the horrible and often barbaric conditions in a Brazilian jail. It is not questioned that the conditions to which Ricky and Karen were subjected to presented a real and immediate threat to their physical and *793 mental well-being and safety. Brazilian newspaper accounts annexed to trustee Goldwater’s affirmation describe primitive and brutal conditions including murders, sexual assaults, torture and abuse which are prevalent in Brazilian prisons in general and particularly where the Sages were confined.
Both Ricky and Karen were held in prison until June 9, 1976. Karen developed serious medical symptoms and on that date was removed to a hospital. Ricky’s subsequent removal to the hospital was authorized on June 16. They both received medical and psychiatric care, were permitted to go home, and remained under treatment to July 2, 1976. The criminal charges were subsequently dismissed and both Ricky and his wife, Karen, continue to reside in Brazil.
Henry M. Sage paid for hospital, medical and psychiatric care for his son and daughter-in-law in the amount of $15,000. He made additional payments totaling $85,000. All trustees authorized the reimbursement of the $15,000 in medical expenses to Mr. Sage. Reimbursement of $10,000 for legal fees was approved by the two individual trustees, with Chemical Bank abstaining therefrom. The court is now called upon to decide whether the $10,000 payment for legal fees, as authorized by the two individual trustees, was a proper exercise of their discretion. Additionally, the court is asked to determine whether the trustees have the discretion to authorize an invasion of principal for the remaining $75,000 to enable Ricky to reimburse his father for the payments made to secure their release from prison.
After sifting through all of the legal papers, affidavits and arguments of all parties, it becomes clear that said payments were in the nature of bribes which were necessary to free these young adults from jail. The affirmation of trustee Goldwater is replete with statements which clearly show that these substantial payments obtained special treatment and speedy release for the trust beneficiaries. The trustee’s affirmation refers to "special attorney fees”; "payments to secure the special treatment for Karen and Ricky and their speedy release”; "Ricky and Karen would not have been able to survive the rigors of a regular jail confinement and that the payments which had been made to the lawyers involved were absolutely essential to secure the special treatment which was given them”; "it was essential that arrangements be made to secure special treatment for Ricky and Karen and to expedite their release”; and "it was absolutely essential to make the *794 payments herein described as legal fees in order to protect their health and welfare”. Further, in trustee Goldwater’s memorandum of law, it is stated, "it was essential that substantial monies be paid in the nature of 'legal expenses’ "funds to pay the attorneys having close affiliations with the representatives of the penal and judicial system”.
The cross petition of trustee Goldwater further provides in paragraph six that "the amounts referred to in the petition of Chemical Bank as 'legal expenses’ were not payments to attorneys for legal services rendered by those attorneys, but were rather payments made to the attorneys to be utilized to expedite the release of Ricky and his wife Karen from prison and to remove them as quickly as possible from an environment which threatened their ability to stay alive.” It is conceded by all parties that these special payments, enabled the couple to be kept separate and apart from the common detention cellblocks during their period of imprisonment. These payments were also classified as necessary to secure the dismissal of the charges.
The tortuous legal arguments presented fail in their attempt to turn a bribe into a legal expense. The papers before this court clearly indicate that special treatment and quick release was "purchased” by these payments. If this is fact, then the parties herein benefited from such an unjust legal system. So be it. But it is somewhat incredulous to then expect an American court of law to reimburse the family for such illegal payments. This court decries any judicial system where special treatment and speedy release can be purchased for the right price; where the rich are favored; where justice is greedy and not blind. While it is not usual for an American court to sit in judgment of a foreign legal system, this court is being asked to do just that by approving moneys paid to secure special treatment and a release from a foreign prison. Clearly the answer must be no. This court cannot sanction such illegal payments by permitting the requested invasion of trust funds.
The court does not for a moment doubt the very real fear for the safety and well-being of these children. The papers paint a picture of prison life which humane individuals can barely comprehend. The court is presented with a most brutal depiction of prison conditions. And these two Americans, beneficiaries of a substantial trust, found themselves thrown into such a foreign and inhuman environment. It is not necessary for this court to delve into the cause or merits of *795 the imprisonment itself; nor can it question the motives of a father’s decision to employ this means to free his children from such intolerable and life-threatening prison conditions. No father could do less. The lyrics of contemporary rock music capture the ageless seeking of a child for a parent’s held— "Send lawyers, guns and money/ Dad, get me out of this.” And while Dad did answer and get his children out, this court cannot indorse the methods employed.
Trustee Goldwater’s memorandum of law states that "the fundamental issue to be decided is whether or not this Court should interfere with the absolute discretion which the testator granted to the trustee, or whether there is in the record before this Court any indication that the individual trustees have abused or will abuse their discretion if they permit the invasion for the purposes indicated.” However, the dispositive issue is whether New York public policy allows a court to authorize an invasion of trust principal to reimburse a beneficiary for payments made to secure "special treatment” while in a foreign prison and to secure "special consideration” from the foreign court resulting in dismissal of criminal charges.
Trustee Goldwater, in his memorandum of law, cites Matter of Carter (15 Misc 2d 599) in support of his position that the court should not interfere with the discretion conferred upon the trustees. That case specifically provides that "[i]n the absence of abuse of discretion, bad faith, arbitrary action, fraud or diversion of the fund to improper purposes, the courts will nor ordinarily interfere with the exercise of discretion which has been confided to the trustees.” (Matter of Carter, supra, p 601.) The circumstances of the case at bar raise the question as to whether the payments made to aid the imprisoned children constituted a "diversion of the fund to improper purposes”. In addressing that issue, Mr. Goldwater provides the following soliloquy: "Assume that Ricky and Karen had been kidnapped and held for ransom and Ricky had sent a note to Henry requesting him to borrow the money to secure their release, sending along photographs of the tortures which had been inflicted on their bodies with a threat of further torture or death if the money was not paid. Assume further that Henry had made arrangements to borrow the money to secure their release and that thereafter Ricky had made application for an invasion on the ground that the payment of the funds were made in his behalf in order to save his life and that they were, in effect, necessary to meet an emergency *796 affecting his health or welfare or that of his spouse. There is no question but that the payment would fall within the enlargement language of 10-A.”
If the actual facts of this case coincided with the hypothetical propounded by trustee Goldwater, this court would be hard pressed to deny the trustees the discretionary right to invade principal for such an emergency. However, the payment of ransom is neither against any stated public policy of this State, nor in violation of any penal statute. Contrarily, payment of funds for purposes which would be catergorized as bribes would be in direct violation of New York law. Article 200 of the New York State Penal Law sets forth the varying degrees of criminality attached to payments of moneys to public officials for receipt of special consideration or favors. This court cannot agree with trustee Goldwater’s conclusion that there is “no justification for limiting the exercise of the power to invade to direct expenditures for doctors and hospitals while denying the invasion for other obligations incurred for emergency purposes for Rick and Karen’s health or welfare.” This rationale is overly broad. Rather, the court must examine the circumstances surrounding the emergency. There is no question that very often, funds invaded for such situations are proper and may be the basis for invasion of the principal of the trust. However, the court must discern whether or not such invasion is proper, despite a finding that an emergency does in fact exist. EPTL 7-1.4 specifically provides that “An express trust may be created for any lawful purpose. ” (Emphasis supplied.) Likewise, the Court of Appeals, in a recent decision, Matter of Gilbert (39 NY2d 663, 666), has reiterated this statutory requirement by providing that when construing a trust for the probable intention of the grantor, "effect is to be given to that intention unless it is contrary to public policy or law”.
The general rules as to illegality of trust agreements are succinctly set forth in Scott on Trusts ([2d ed], vol 1, § 60). This treatise provides in pertinent part that a trust may fail “where the performance of the trust or provision involves the commission of a criminal or tortious act [or] where the enforcement of the trust or provision would be against public policy, even though its performance does not involve the commission of a criminal or tortious act”. Section 62 sets forth situations where actions have been held invalid on the grounds that their enforcement would be against public policy.
*797 This court cannot sanction conduct which would be at worse punishable as a criminal offense if committed within this State, and at best, contrary to our public policy. Even if the court were to accept the premise that the children were improperly jailed and that the only way to save their lives was to make illegal payments to obtain their release, such an expenditure of trust funds could not be authorized by a court of law in this State. It would be clearly against New York State public policy to authorize such expenditures of trust funds. To go a step further, if the trust provision itself explicitly authorized the use of trust funds for illegal purposes, or more specifically, to pay bribes, a court could not permit such use of trust funds (EPTL 7-1.4).
A trust is a legal device which provides for the use of one’s funds for others in a specified manner. As a legal device, it comes within the ambit of our legal system. As such, it cannot become a vehicle for illegal conduct or activity. It is a sacred legal creation which cannot be soiled by any illegal use, even in the most pressing situations. The law cannot adopt the doctrine that the ends justify the means, no matter how painful the result may be. On a more practical level, to hold otherwise would give a legal basis for the invasion of trust funds for all kinds of illegal payments.
As stated previously, the payment of $15,000 in medical expenses, is within the discretion of the trustees and is hereby ratified and confirmed. However, in response to the request for advice and directions concerning the initial payment of $10,-000 and the additional payments amounting to $75,000, this court specifically holds that such payments are beyond the discretion of the trustees’ powers. The $10,000 previously advanced is hereby directed to be repaid to the principal of the trust. The alternative relief requested regarding permission to take a loan from the trust funds is equally unacceptable. Such a loan would merely be a sham to reimburse Henry M. Sage for the illegal payments made to obtain the release of his children and the purpose of said loan is therefore not within the discretion of the trustees.
In all other respects, the accounts are hereby judicially settled and allowed, and the trustees discharged from all liability, accountability and responsibility as to their acts and proceedings as trustees for the following periods: (a) Chemical Bank from July 20, 1972 through December 31, 1977; (b) Henry M. Sage from July 20, 1972 through November 5, 1976; *798 (c) Richard M. Goldwater from November 12, 1976 to December 31, 1977; and (d) Isadore Daniels from January 31, 1977 through December 31, 1977. Isadore Daniels is hereby permitted to resign as cotrustee and Henry M. Sage and Isadore Daniels are discharged from all liability with respect to the trust. The trustees are authorized to pay commissions as set forth in schedule (i) of the account as filed and to continue to pay annual commissions hereafter in accordance with the laws of the State of New York. One full commission each is allowed to Chemical Bank and Richard M. Goldwater. This court will further allow the trustees their reasonable costs, disbursements and expenses in this proceeding, including attorneys’ fees of Dewey, Ballantine, Bushby, Palmer and Wood, attorneys for the trustees until November 12, 1976, and since that date for Chemical Bank as trustee; any legal fees of Richard M. Goldwater, as attorney for himself and Isadore Daniels, the individual trustees and also for the adult income beneficiaries; and the fee of the guardian ad litem, William P. Soronen, Jr., heretofore appointed by the court to represent the infant remaindermen. Upon receipt of affidavits setting forth the services of the respective attorneys, this court will pass on the reasonableness of any fees requested.